*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee

v

MICHAEL VERN McNAIR,

        Defendant-Appellant.

UNPUBLISHED
May 30, 2024

Nos. 364805; 364806
Berrien Circuit Court
LC Nos. 2020-002721-FH;
        2022-000129-FH

Before: YATES, P.J., and CAVANAGH and BOONSTRA, JJ.

PER CURIAM.

Defendant, Michael Vern McNair, was convicted by a jury on numerous drug and firearm charges. Because he fled to California on the eve of his trial, he was also convicted of absconding, MCL 750.199a. On appeal, defendant challenges the trial court's denial of three separate motions to suppress evidence seized by law-enforcement officers. He also questions the sufficiency of the evidence supporting his conviction for possession with intent to deliver a controlled substance in an amount of 50 grams or more, but less than 450 grams, MCL 333.7401(2)(a)(*iii*). Beyond that, in a Standard 4 brief, defendant argues that the trial court improperly limited his use of peremptory challenges in jury selection. Defendant further insists that the affidavit supporting the application for a search warrant for his cellular telephone was deficient. Finally, defendant contends that the trial court impermissibly questioned a witness at trial. Because we find no reversible error in any of the issues raised by defendant or his attorney, we affirm.

## I. FACTUAL BACKGROUND

On August 13, 2020, postal inspectors interdicted a suspicious package, used a canine sniff to test the package, and observed that the dog alerted, thereby indicating that the package contained a controlled substance. Postal inspectors thereafter applied for, and obtained, a warrant to search the package. The warrant-based search revealed two small bags of a white powder that contained cocaine in the amount of 55.9 grams. The postal inspectors noted that the package was addressed to "Hendrickson" at 13903 Prairie Road, Three Oaks, Michigan (the Hendrickson House), and that it was sent from Fresno, California, with the sender's name listed as "Rodgger Smith." Additional investigation revealed that someone in southwest Michigan was tracking the package.

A postal inspector contacted Lieutenant Shawn Yech of the Southwest Enforcement Team to arrange a controlled delivery of the package. On the morning of August 14, 2020, an undercover officer delivered the package to the Hendrickson House and left it outside of an exterior door in the rear of the residence. Approximately 40 minutes later, police officers saw a red SUV pull into the driveway of the residence. Defendant stepped out of the driver's side of the SUV, walked to the back door, retrieved the package, returned to the SUV, and left the property.

After the SUV left the Hendrickson House and began traveling on Prairie Road, Lieutenant Yech followed the vehicle and police officers prepared to conduct a traffic stop. Before that traffic stop occurred, however, the SUV turned into the driveway of the house at 14094 Prairie Road (the Kobel House), which was approximately 1/10th of a mile from the Hendrickson House. Lieutenant Yech then took defendant into custody in the driveway. No other people were in the SUV. Next, Lieutenant Yech questioned defendant, who said he did not know anything about the house and he did not live there. Lieutenant Yech asked defendant about the package. Defendant said he did not know anything about the package. Indeed, he did not even acknowledge that there was a package.

After Lieutenant Yech secured defendant, he spoke with the owner of the property, Cynthia Kobel, who said she knew defendant and that he lived in the house. In addition to Kobel, her adult son was also present in the house. At that time, Lieutenant Yech was not sure whether it was safe for the officers to be in that area, but Kobel invited Lieutenant Yech into the house to look around. After looking around the house, Lieutenant Yech obtained a search warrant for the house, but his main focus was an upstairs bedroom that Kobel said was defendant's bedroom. Lieutenant Yech characterized the upstairs area of the house as "not a full upstairs," but more like an apartment that had a bedroom and a bathroom.

Law-enforcement officers who searched the upstairs bedroom found defendant's clothing, personal pictures, mail, medication, and driver's license. Further, in a television stand, Lieutenant Yech found 9.7 grams of fentanyl, half a gram of heroin, materials he believed to be for packaging narcotics, and an empty bottle of Dormin, a sleep medication commonly used as a cutting agent. In a drawer, Lieutenant Yech found two capsules containing hydrocodone. Lieutenant Yech also discovered $5,230 in cash in a box on top of a dresser as well as $1,200 in cash in an envelope in a drawer. The seized currency included $170 in counterfeit bills. Also in the bedroom, Lieutenant Yech found a digital scale with residue containing cocaine and marijuana. He believed the cocaine in the package and the fentanyl were intended for distribution based upon the weight, the packaging materials, the scale, the lack of paraphernalia, the money, and the other drugs. In a dresser drawer, Lieutenant Yech discovered a handgun and ammunition. When he checked the registration for the gun, he found out that it was stolen. Lieutenant Yech noted that defendant was a convicted felon, so defendant could not register a gun in his own name.

Law-enforcement officers also searched the SUV while it was in the driveway of the Kobel House. On the floorboard of the front passenger seat was the package that defendant had retrieved from the Hendrickson House. Officers also found defendant's cellular telephone in the front seat. When police seized the cellular phone, they saw a notification on the phone that it had received an incoming message from a contact named "Fresno." The phone was locked, so officers were only able to retrieve a single photograph from the phone. Officers determined that that photograph had either been sent or received by the phone via text message on August 10, 2020, but they could not tell which. The photograph depicted a hand holding small bags that were similar in size and shape

-2-

to the bags of cocaine that were in the interdicted package.  The SUV also contained an insurance card with the name Robert Shamar Sims and a speeding ticket issued to Sims.[1]

Defendant claimed that Sims used the cellular phone all the time because the phone stayed in the SUV, and he said that the last time Sims used the phone was on August 13, 2020.  Lieutenant Yech testified, however, that in pleadings in the case, defendant acknowledged that the phone was his.  During trial, defendant explained that he picked up the package from the Hendrickson House because he had an arrangement with the residents of the Hendrickson House—Leona Hendrickson and her partner, George Donahue—that he would pick up their mail and packages when they were out of town.  Hendrickson and Donahue were out of town most of the time from June to October every year.  Defendant said that if he saw mail sticking out of the mailbox, he would retrieve the mail and check for packages behind the house.  Defendant said he went to the Hendrickson House to pick up the mail and packages only when he could see mail sticking out of the mailbox because he did not want to go over to the house every day.  Defendant said that, on August 14, 2020, there was no mail sticking out of the mailbox when he was at the Hendrickson House, so he did not stop at the mailbox.  Rather, he went straight to the back of the residence and retrieved the package that the undercover officer had left there.

Defendant's trial was scheduled to begin in January 2022, but defendant did not show up.  Instead, he cut off his GPS tether unit and went to San Diego, California, where he was eventually arrested.  When the trial did take place, defendant attempted to implicate Sims as the true owner of the gun and the drugs, and he denied that he had any involvement in any of the charged drug or gun crimes.  Defendant introduced into evidence phone records that showed that a phone number associated with Sims's phone had made or received 23 calls to a phone with a Fresno, California, area code.  But the same records also showed calls between defendant's cell phone and the number allegedly belonging to Sims in the days leading up to defendant's arrest.  The jury found defendant guilty of possession with intent to deliver 50 grams or more (but less than 450 grams) of cocaine, MCL 333.7401(2)(a)(*iii*); possession with intent to deliver less than 50 grams of fentanyl, MCL 333.7401(2)(a)(*iv*);  possession of a firearm by a felon, MCL 750.224f; possession of heroin, MCL 333.7403; possession of hydrocodone, MCL 333.7403; four counts of possessing a firearm during the commission of a felony, MCL 750.227b; and absconding, MCL 750.199a.  After he received substantial prison sentences for his crimes, defendant filed this appeal.

## II. LEGAL ANALYSIS

On appeal, defendant challenges his conviction for possession with intent to deliver cocaine found in the interdicted package as unsupported by sufficient evidence because the prosecutor did not prove beyond a reasonable doubt that defendant knew the package contained cocaine.  Also, defendant's attorney argues that the trial court erred when it denied defendant's motion to suppress the fruits of the search of the package, denied defendant's motion to suppress the evidence seized

---

[1] According to defendant, he met Sims in 2016 or 2017, and he knew Sims because defendant grew up with Sims's grandmother.  Defendant explained that he permitted Sims to drive the SUV while defendant was in Chicago, where he sometimes stayed.  Defendant said that Sims drove the SUV much more than defendant did, and that he had Sims get insurance for the vehicle because Sims drove it so often.  Defendant claimed that Sims had the SUV from August 9 to August 13 in 2020.

in the search of defendant's vehicle, and denied defendant's motion to suppress the evidence found in the search of defendant's bedroom. In a Standard 4 brief, defendant argues that the affidavit in support of the application for the warrant to search his cellular telephone was deficient. Defendant also claims that the trial court erred when it limited him to only five peremptory challenges during jury selection. Finally, defendant asserts that the trial court committed judicial misconduct in its questioning of a potential trial witnesses, i.e., Sims. We shall address these arguments in turn.

## A. INSUFFICIENT EVIDENCE

Defendant contends that the prosecution failed to prove that he knew the package he picked up at the Hendrickson House contained cocaine, so the record does not include sufficient evidence to establish an essential element of possession with intent to deliver 50 grams or more of cocaine. See MCL 333.7401(2)(a)(*iii*). "The test for determining the sufficiency of evidence in a criminal case is whether the evidence, viewed in a light most favorable to the people, would warrant a reasonable juror in finding guilt beyond a reasonable doubt." *People v Nowack*, 462 Mich 392, 399; 614 NW2d 78 (2000). This analysis considers whether a rational trier of fact could find that the elements of the crime were proven beyond a reasonable doubt. *People v Reese*, 491 Mich 127, 139; 815 NW2d 85 (2012). "The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *Nowack*, 462 Mich at 400. This Court should not interfere with the fact-finder's role of assessing the weight of the evidence and the credibility of the witnesses at trial. *People v Wolfe*, 440 Mich 508, 514; 489 NW2d 748 (1992). "Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *Nowack*, 462 Mich at 400 (quotation marks omitted). The fact-finder, not this Court, must decide which inferences can be drawn from the evidence and must determine the weight to be given to those inferences. *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002). Conflicts arising from the evidence must be resolved in favor of the prosecution, *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008), and "the prosecutor need not negate every reasonable theory consistent with innocence." *Nowack*, 462 Mich at 400.

According to MCL 333.7401, "a person shall not manufacture, create, deliver, or possess with intent to manufacture, create, or deliver a controlled substance . . . ." "A person who violates this section as to . . . a controlled substance classified in schedule 1 or 2 that is a narcotic drug or a drug described in section 7214(a)(*iv*) and . . . [w]hich is in an amount of 50 grams or more, but less than 450 grams, of any mixture containing that substance is guilty of a felony punishable by imprisonment for not more than 20 years or a fine of not more than $250,000.00, or both." MCL 333.7401(2)(a)(*iii*). To convict a defendant of possession with intent to deliver, the prosecution must prove "(1) that the recovered substance is a narcotic, (2) the weight of the substance, (3) that the defendant was not authorized to possess the substance, and (4) that the defendant knowingly possessed the substance intending to deliver it." *People v McGhee*, 268 Mich App 600, 622; 709 NW2d 595 (2005) (citations omitted).

Here, defendant focuses on the portion of the fourth element of the charge that requires the prosecution to establish that defendant knowingly possessed the substance. See *id*. But when the evidence is viewed in a light most favorable to the prosecution, see *Nowack*, 462 Mich at 399, the evidence against defendant is sufficient to cause a rational trier of fact to find that the prosecution

proved beyond a reasonable doubt that defendant knowingly possessed the cocaine that was found inside the package he retrieved from the Hendrickson House. See *Reese*, 491 Mich at 139.

At trial, the evidence demonstrated that police officers knew that someone in that area of southwest Michigan was tracking the package. Defendant testified that ordinarily when he picked up mail at the Hendrickson House, he did so when mail was sticking out of the mailbox because he did not want to pick up their mail every day. But defendant stated that on August 14, 2020, he went to the Hendrickson House even though there was no mail sticking out of the mailbox. In fact, he testified that he did not even stop at the mailbox, but instead went directly to the back door to retrieve the package behind the house. And he did so within 40 minutes of the package being delivered. When viewing this evidence in the light most favorable to the prosecution, a reasonable inference is that defendant knew the package was there, so he had knowledge about the contents of the package. See *Nowack*, 462 Mich at 400.

That inference is bolstered by the fact that defendant's bedroom—about which he initially lied to the police—contained drugs, a large amount of cash, materials used to package drugs, and a scale often used in connection with drug trafficking that had cocaine residue on it. That evidence further supports the inference that defendant had received the package as part of an ongoing drug-distribution scheme, so defendant was aware that the package he retrieved contained cocaine.

At trial, defendant attempted to implicate Sims as the culprit, and there was some evidence that Sims was involved in drug trafficking, such as defendant's testimony that he saw Sims with drugs and the gun, as well as phone records reflecting numerous calls between a Fresno area code and a phone number that was purportedly associated with Sims's phone. But the jury clearly found defendant's testimony about seeing Sims with drugs and the gun incredible, and this Court cannot interfere with the jury's role of determining the credibility of the witnesses. See *Wolfe*, 440 Mich at 514. Additionally, those same phone records revealed frequent phone communication between Sims's phone and defendant's phone during the same time period when Sims made contact with a phone with a Fresno area code. To be sure, the phone records revealed that Sims may have known about the package, but those records did not negate the likelihood that defendant was also involved with the package. In other words, the phone records suggested that Sims and defendant may have been working together.

In sum, when the evidence is viewed in the light most favorable to the prosecution and all reasonable inferences and credibility determinations are made in favor of the jury's verdict on the charge, a reasonable juror could have found beyond a reasonable doubt that defendant was aware that the package contained cocaine. Hence, the jurors could have found beyond a reasonable doubt that defendant was guilty of possession with intent to deliver 50 grams or more of cocaine, which was the charged offense under MCL 333.7401(2)(a)(*iii*) for which defendant was convicted. Thus, we reject defendant's challenge to the sufficiency of the evidence supporting his conviction.

## B. VALIDITY OF THE SEARCHES

Next, defendant contests the validity of the search of the package, the search of the SUV, the search of his bedroom, and the search of his cellular telephone. Before trial, defendant filed a trio of suppression motions, which sought suppression of: (1) evidence found during the search of

his upstairs bedroom; (2) evidence found in the SUV; and (3) evidence found in the search of the package. Defendant did not contest the validity of the warrant issued to search his cellular phone.

Postal inspectors obtained a warrant to search the package after a canine indicated that the package contained a controlled substance. Beyond the canine alert, features of the package aroused the postal inspectors' suspicions. During the subsequent warrant-based search, postal inspectors discovered that the package contained 55.9 grams of cocaine.

Another warrant was later issued to search the Kobel House, including defendant's upstairs bedroom. Before police officers obtained that search warrant, Lieutenant Yech and another officer conducted a warrantless search of that house. Lieutenant Yech and Cynthia Kobel, the owner of that house, testified about that warrantless search. After defendant was in custody in the driveway of the Kobel House on August 14, 2020, Lieutenant Yech, and another officer spoke with Kobel. She told Lieutenant Yech that defendant was a caretaker for that property, and that he stayed at the house in the upstairs bedroom when he was not in Chicago. Kobel then showed the officers around the house so the officers could see that the only other person in the house was Kobel's adult son. Lieutenant Yech explained that this tour of the house was done to ensure that no other individuals with guns were inside waiting to harm the officers and to ensure that nobody was destroying any evidence that might be in the house. According to Lieutenant Yech, Kobel told him that she did not know if anyone was upstairs in defendant's bedroom, but Kobel testified that she thought no one was in the upstairs bedroom because defendant had not been home for a couple of days.

Eventually, the walkthrough of Kobel's house led officers to a stairwell up to defendant's upstairs bedroom. Describing those stairs, Lieutenant Yech said "[t]here was a door at the bottom of the stairs, which was open at the time, along with a long narrow carpeted staircase that went up to what [Kobel] described as a – a bedroom and bathroom upstairs." Lieutenant Yech stated that, at the top of the stairs, there was a dog gate that was open. Before going upstairs, Lieutenant Yech talked about that upstairs area with Kobel, who told him the upstairs was defendant's room. Kobel would go up there occasionally, but not commonly. Lieutenant Yech later testified that before he went up the stairs, Kobel told him she was not allowed to go into the upstairs bedroom. Kobel's adult son also told Lieutenant Yech that defendant stayed in the upstairs bedroom and defendant was the only one who went up there.

Lieutenant Yech and another officer went to the top of the stairs, looked around, and then left. In that brief glance into the room, Lieutenant Yech saw a digital scale, packaging material, a 5-gallon jug full of money, and a large amount of marijuana that he did not believe to be over the legal limit. Lieutenant Yech explained that the reason he left and sought a search warrant despite receiving consent to search from Kobel was that he had concerns about whether Kobel could give consent to search the upstairs area. After obtaining a search warrant, Lieutenant Yech returned to the house and searched the upstairs bedroom, where he found drugs, a gun, and a large quantity of cash. Although the search warrant also covered defendant's vehicle, testimony at the evidentiary hearing revealed that defendant's vehicle was searched before the search warrant was issued.

In his motion to suppress the evidence found in the search of the package, defendant argued that the affidavit submitted with the application for that warrant was insufficient because it did not include any mention of whether the canine that conducted the sniff test had successfully completed any reliability test in a controlled setting. In defendant's motion to suppress the evidence found in

his vehicle, defendant acknowledged that the police officers had probable cause to stop his vehicle and seize the package containing cocaine. But defendant argued that, under *California v Acevedo*, 500 US 565; 111 S Ct 1982; 114 L Ed 2d 619 (1991), the police officers did not have the authority to search any other part of the SUV, so any evidence found in that vehicle, including the cell phone and any evidence obtained from the cell phone, must be suppressed. Finally, in defendant's motion to suppress the evidence found in the upstairs bedroom, defendant asserted that the search of that area was invalid because observations mentioned in the affidavit for the warrant were made during an unlawful protective sweep of the Kobel House. Defendant argued that without the observations officers made of the digital scale and packaging materials during the protective sweep, the affidavit supporting the search warrant lacked probable cause.

The trial court carefully considered all three suppression motions filed by defendant and in well-reasoned decisions denied all the motions. On appeal, defendant has not only contested each of the rulings, but also expanded his arguments to include the search of his cellular telephone. We find no basis to suppress any of the evidence seized by law-enforcement officers and used against defendant at his trial. We shall explain why we reject each challenge raised by defendant.

## 1. THE PACKAGE

Defendant contends that the trial court erred in denying his motion to suppress the package and its contents, i.e., more than 50 grams of cocaine, that he retrieved from the Hendrickson House. Although defendant insists that the affidavit in support of that search warrant was insufficient, the trial court ruled that defendant lacked standing to attack the search warrant. On appeal, defendant does not address standing, and he provides no argument that the trial court erred when it ruled that he lacked standing. Because defendant has made no argument to challenge the trial court's ruling, we conclude that the trial court did not err when it determined that defendant lacked standing to challenge the warrant issued to search the package.

In any event, the trial court's conclusion that defendant lacked standing is well-supported. Defendant has the burden of showing that he has standing to challenge the search warrant. *People v Zahn*, 234 Mich App 438, 446; 594 NW2d 120 (1999). "To the extent a trial court's decision regarding a motion to suppress is based on an interpretation of the law, appellate review is de novo." *Id*. at 445. Generally, "both the sender and the addressee have a legitimate expectation of privacy with regard to a mailed item while the item is en route." *Id*. at 446. This Court has ruled, however, that even if a package is sent to the defendant's address, the defendant lacks standing to contest a search of the package if the defendant's name does not appear on the package. *People v Lombardo*, 216 Mich App 500, 502-503, 509-510; 549 NW2d 596 (1996). Here, nothing on the package linked it to defendant. Hence, defendant had no reasonable expectation of privacy in the package, so he lacked standing to challenge its search. See *Zahn*, 234 Mich App at 446; *Lombardo*, 216 Mich App at 502-503. Therefore, the trial court correctly ruled that defendant lacked standing to challenge the search of the package.

## 2. DEFENDANT'S VEHICLE

Defendant challenges the warrantless search of his vehicle that took place in the driveway of the Kobel House shortly after his arrest. Defendant claims that search was unjustified pursuant to *Acevedo*, 500 US at 580. The United States Supreme Court has stated that, "when a policeman

has made a lawful custodial arrest of the occupant of an automobile, he may, as contemporaneous incident of that arrest, search the passenger compartment of that automobile." *New York v Belton*, 453 US 454, 460; 101 S Ct 2860; 69 L Ed 2d 768 (1981). That ruling authorizes the search of any containers within the passenger compartment, including any consoles. *Id*. at 460 & n 4. A search incident to arrest is permissible when "it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Arizona v Gant*, 556 US 332, 343; 129 S Ct 1710; 173 L Ed 2d 485 (2009). The United States Supreme Court has explained that in the case of arrests for drug offenses, the offense of arrest supplies a basis to search the passenger compartment of the arrestee's vehicle and any containers found in the passenger compartment. *Id*. at 344.

In *Acevedo*, 500 US at 580, the United States Supreme Court ruled that "police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." There, the United States Supreme Court addressed the law that governs closed containers in an automobile. *Id*. at 568. Clarifying the then-existing caselaw, the Supreme Court stated that "[t]he police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." *Id*. at 580. Conversely, the Supreme Court stated that a search of the entire vehicle would have been without probable cause when police knew a bag of marijuana had been put in the trunk of the car, but the police did not have probable cause to believe that contraband was hidden in any other part of the vehicle. *Id*. In *Acevedo*, the search was not conducted incident to arrest. *Id*. at 567.

Both this Court and the Michigan Supreme Court have addressed *Acevedo*'s application to cases similar to defendant's case. In *People v Bullock*, 440 Mich 15, 23; 485 NW2d 866 (1992), our Supreme Court noted that it was unnecessary to determine whether a warrantless vehicle search was permissible under *Acevedo*. *Id*. at 26. Because the defendant in *Bullock* was arrested at that time, police officers were authorized to search the entire passenger compartment of the automobile and any containers found in the passenger compartment, including the glove compartment. *Id*. In *Bullock*, the offense of arrest was a drug crime, *id*. at 21, which the United States Supreme Court had identified as authorizing a search of the entire passenger compartment of the arrestee's vehicle and any containers in the passenger compartment. See *Gant*, 556 US at 344.

In *People v Eaton*, 241 Mich App 459; 617 NW2d 363 (2000), this Court expressly rejected the defendant's reliance on *Acevedo* because *Acevedo* involved the search of a trunk whereas *Eaton* involved a search of the passenger compartment. *Eaton*, 241 Mich App at 465 ("Unlike the cases cited by defendant [which included *Acevedo*], the drugs found beneath the gearshift were found in a container located within the passenger compartment of defendant's car and, therefore, the search did not exceed the scope allowed by *Belton*.").

Here, defendant does not claim that his arrest on August 14, 2020, for a drug-related offense was unlawful. Therefore, the police were authorized to conduct a search of his vehicle incident to that arrest for a drug offense. See *Gant*, 556 US at 344; *Bullock*, 440 Mich at 26. It was reasonable for police to believe defendant's vehicle contained evidence related to the offense of arrest, i.e., possession of cocaine, when they knew that a package containing cocaine was in the vehicle. See *Gant*, 556 US at 343. Like our Supreme Court in *Bullock*, we arrive at this conclusion without the need to address whether the police had probable cause to conduct a search under *Acevedo*. *Bullock*, 440 Mich at 26. Additionally, even if *Acevedo* did apply to a search incident to arrest, this Court has made clear that *Acevedo* does not apply to a search of a passenger compartment of a vehicle.

*Eaton*, 241 Mich App at 465. Thus, the search of defendant's vehicle was a lawful search incident to arrest, and the trial court did not err when it denied defendant's motion to suppress the evidence found during that warrantless search.

### 3. DEFENDANT'S BEDROOM

Defendant asserts that the police violated his Fourth Amendment rights when they walked to the top of the stairs and looked into his bedroom during the warrantless tour of the Kobel House. Defendant maintains that that search was not a valid protective sweep. He also contends that he had an expectation of privacy that began at the bottom of the stairs, so the consent from Kobel did not authorize the police to go to the top of the stairs. Defendant notes that the subsequent affidavit filed to support the application for a search warrant of the Kobel House included Lieutenant Yech's observation of a digital scale and packaging material in defendant's bedroom while the lieutenant was standing at the top of the stairs. Defendant insists that when that observation is removed from the affidavit, probable cause to issue the search warrant of the Kobel House no longer exists, and so the evidence seized from his bedroom during the warrant-based search must be suppressed. We agree with defendant that a protective sweep did not authorize Lieutenant Yech to walk to the top of the stairs, but we disagree that the result of defendant's suppression motion turns on defendant's expectation of privacy, and we also disagree that the search warrant was invalid.

### a. PROTECTIVE SWEEP

"As a general rule, searches conducted without a warrant are per se unreasonable under the Fourth Amendment unless the police conduct falls under one of the established exceptions to the warrant requirement." *People v Beuschlein*, 245 Mich App 744, 749; 630 NW2d 921 (2001). One exception to the warrant requirement is a "protective sweep." "The Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Maryland v Buie*, 494 US 325, 337; 110 S Ct 1093; 108 L Ed 2d 276 (1990). Here, however, defendant contests the applicability of the "protective sweep" doctrine, and we agree with defendant and the trial court that the doctrine does not apply in this case. First, defendant was arrested in the driveway of the Kobel House, so the arrest of defendant was not an in-home arrest, as required by *Buie*.[2] See *id*. Second, the record does not establish that the searching officers had a reasonable belief that the house contained "an individual posing a danger to those on the arrest scene." See *id*. The searching officers were made aware that there were two people in the house, Kobel and her son. The officers were also informed that Kobel's son was sleeping in his bedroom, which was not where defendant stayed. No evidence linked Kobel or her son to defendant's drug activity, so the trial court did not err when it concluded that the officers' entry of the stairwell to defendant's room was not a valid protective sweep.

---

[2] In explaining why the protective sweep doctrine did not apply, the trial court observed that "the protective sweep is not so broad as to give the police, based upon the arrest out in the driveway, in the car, of the defendant, the authority to go into the house or any outbuildings at that point and search without a search warrant."

## b. CONSENT

The lack of authority to support a protective sweep, however, does not necessarily mandate suppression of the evidence found in defendant's upstairs room at the Kobel House. The trial court appropriately considered other grounds that could justify the search, including consent from Kobel. The warrant requirement may be waived if a homeowner consents to a search. *People v Goforth*, 222 Mich App 306, 309; 564 NW2d 526 (1997). To determine the validity of the consent for the search, the trial court should review the totality of the circumstances. *Id*. A third party can consent to a search, and the inquiry is "whether the police reasonably believe that the third party consenting to a search has common authority over the premises." *Id*. at 312. Even if the third party does not actually have authority to consent, the search is still valid if the police officer reasonably believed that the third party had the authority to consent. *Id*. But common authority cannot "be implied by the mere property interest a third party has in the property." *Id*. at 311, quoting *United States v Matlock*, 415 US 164, 171 n 7; 94 S Ct 988; 39 L Ed 2d 242 (1974). It rests "on the mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Id*. at 311-312.

The trial court did not err when it determined that Kobel gave consent to the police officers to be in the house, but that consent only extended to areas over which the police officers reasonably believed that Kobel had common authority. See *id*. at 312. Accordingly, the focus of this inquiry is on the police officers' reasonable belief about Kobel's common authority over the stairwell, not simply defendant's expectation of privacy. See *id*. Even if defendant had an expectation of privacy in the stairwell, the police officers' entry of the stairwell would have been lawful if they reasonably believed that Kobel had the authority to consent to their search of that area. See *id*. Here, the trial court erred when it restricted its analysis to defendant's expectation of privacy, and did not analyze whether the officers had a reasonable belief that Kobel had common authority over the stairwell in a manner that enabled her to consent to the officers' entry of the stairwell. See *id*.

The record reveals that the officers did not have a reasonable belief that Kobel had common authority over the stairwell. There seems to be agreement that the officers believed that Kobel did not have common authority over the room at the top of the stairs, so Kobel could not consent to a search of that room. Indeed, the officers walked to the top of the stairs, but did not enter the room. The parties disagree, however, about whether Kobel had authority to consent to the officers' entry into the stairwell. Lieutenant Yech had concerns about Kobel's authority to give consent to enter the stairwell. Before he or the other officer entered the stairwell, Lieutenant Yech talked to Kobel and "tried to establish if she goes upstairs, how often she goes upstairs, what she keeps upstairs." Lieutenant Yech testified that when the officers and Kobel got to the stairwell, Kobel told him that it led up to defendant's bedroom and "she does go upstairs but that . . . he likes his privacy, so she doesn't commonly go up there." Thus, Kobel believed the act of going up the stairs encroached on defendant's privacy. Lieutenant Yech testified that Kobel told him that defendant "lives in the upstairs bedroom and that [Kobel] is not allowed to go upstairs." After receiving that information, Lieutenant Yech nevertheless climbed to the top of the stairs. Kobel testified that she did not give consent for the officers to go into defendant's bedroom because they did not ask for that consent.

Later, in discussing whether Kobel consented to the police officers entering the stairwell, Lieutenant Yech stated that "when I was speaking to [Kobel] there was some discretionary issues; if she had access or if she could give consent to search it, that's why we just erred and got a search warrant for the property." He testified that it was due to uncertainty concerning Kobel's authority to give consent that he wrote in the affidavit that his entry into the stairwell was done under the authority of a protective sweep, not pursuant to Kobel's consent. That testimony does not establish that Lieutenant Yech believed Kobel had the authority to consent to his entry of the stairwell. And to the extent that Lieutenant Yech even held that belief, it was unreasonable to believe that Kobel's common authority of the stairwell extended to a point that she could "permit the inspection" of the stairs by allowing the officers to climb to the top of the stairs. *Goforth*, 222 Mich App at 311-312. The evidence does not reflect that Kobel and defendant shared "mutual use" of the stairwell and the two of them had "joint access or control for most purposes." *Id.* All Lieutenant Yech knew at that time demonstrated that defendant had the authority to exclude others from the stairs, and that, at most, Kobel could sometimes see the stairs, but not the bedroom, when the door was open. The fact that other occupants of the Kobel House could sometimes see the stairs does not establish that there was "joint access or control for most purposes" of the stairwell, *id.*, so Kobel's consent could not support the officers' actions in climbing the stairs and looking into defendant's upstairs room.

### c. THE AFFIDAVIT SUPPORTING THE SEARCH WARRANT

But the officers who went up the stairs did not enter defendant's room or seize any evidence from his room. They simply made observations that wound up in the application for a warrant to search the room. Thus, the main issue is the validity of the warrant obtained after the officers went up the stairs and made their observations. A search warrant can be issued based on probable cause. "Probable cause to issue a search warrant exists where there is a substantial basis for inferring a fair probability that contraband or evidence of a crime will be found in a particular place." *People v Kazmierczak*, 461 Mich 411, 417-418; 605 NW2d 667 (2000). Probable cause must be based on "facts presented to the issuing magistrate by oath or affirmation." *People v Waclawski*, 286 Mich App 634, 698; 780 NW2d 321 (2009).

If a search warrant "is based partially on tainted evidence and partially on evidence arising from independent sources, if the lawfully obtained information amounts to probable cause and would have justified issuance of a warrant apart from the tainted information, the evidence seized pursuant to the warrant is admitted." *People v Melotik*, 221 Mich App 190, 201; 561 NW2d 453 (1997) (quotation marks and alteration omitted). When an affidavit attached to an application for a search warrant contains observations that were obtained illegally, the search warrant is still valid, and the evidence seized under that warrant need not be suppressed, if the affidavit still established probable cause after the illegally-obtained observations are removed. *People v Smith*, 191 Mich App 644, 648; 478 NW2d 741 (1991).

In this case, the trial court decided that even if the observations of defendant's room were removed from the affidavit, the affidavit still furnished probable cause sufficient to issue a warrant. The observations made by the officers after entering the stairwell amounted to a small portion of the affidavit, and even if those observations were removed, the affidavit still established probable cause to issue the search warrant. In that affidavit, Lieutenant Yech stated that defendant was seen retrieving a package known to contain cocaine and driving it back to a residence. Lieutenant Yech further explained that defendant told police officers that he did not stay at that residence, whereas

-11-

Kobel told police officers that defendant "stayed/utilized the upstairs apartment" of the residence. That information provided a sound basis to infer that contraband or evidence of a crime would be found in the upstairs bedroom, *Kazmierczak*, 461 Mich at 417-418, even after removing Lieutenant Yech's statement that he performed a safety sweep of the upstairs bedroom and "observed a digital scale and narcotics packaging material . . . ."

Defendant's contention that those facts did not establish probable cause consists solely of the conclusory statement that those facts do not amount to probable cause. The affidavit only had to demonstrate a "substantial basis for inferring a fair probability that contraband or evidence of a crime" would be found in the upstairs bedroom. *Kazmierczak*, 461 Mich at 417-418. The fact that defendant picked up a package containing cocaine, lied about his connection to the residence, and the owner of the house confirmed that defendant did live there was sufficient to meet the standard of probable cause. Thus, defendant has failed to establish that the trial court erred when it refused to suppress the evidence found in the upstairs bedroom during the warrant-based search.

## 4. DEFENDANT'S CELLULAR TELEPHONE

In a Standard 4 brief, defendant asserts that the search warrant issued for his cellular phone was invalid because the affidavit supporting the application for that search warrant did not provide probable cause to justify the search. But unlike the other search-warrant challenges in this appeal, defendant did not contest that search warrant in the trial court. Because that issue was not raised in the trial court, we review defendant's challenge for plain error affecting defendant's substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

Defendant's failure to raise the issue below caused the affidavit defendant now challenges to be omitted from the record. In a similar situation, a panel of this Court confined its analysis to what was contained in the lower-court record. *People v Evans*, unpublished per curiam opinion of the Court of Appeals, issued May 14, 2009 (Docket No. 283454), p 1.[3] On the existing record, we cannot conduct any meaningful review of defendant's argument, much less detect a plain error that affected substantial rights. Thus, we must summarily reject defendant's argument.

## C. PEREMPTORY CHALLENGES

Defendant claims the trial court erred when it only allowed him five peremptory challenges during jury selection. Defendant points out that at sentencing, he was sentenced as a fourth-offense habitual offender, so some of his convictions carried potential life sentences. Therefore, defendant reasons that he should have received the increased number of peremptory challenges afforded to defendants charged with crimes that carry a potential sentence of life imprisonment. The number of peremptory challenges is set by statute and is based on the possible punishment for the charged offenses. A defendant is entitled to 12 peremptory juror challenges when being tried for an offense punishable by life imprisonment, MCL 768.13(1), but only 5 peremptory challenges when on trial for offenses not punishable by life imprisonment. MCL 768.12(1); MCR 6.412(E)(1). This Court

---

[3] Although an unpublished opinion has no precedential value, this Court may follow the opinion if it finds the reasoning persuasive. MCR 7.215(C)(1); *People v Green*, 260 Mich App 710, 720 n 5; 680 NW2d 477 (2004).

has rejected the argument that the number of peremptory challenges can be determined by habitual-offender sentence enhancements. *People v Oswald*, 188 Mich App 1, 12; 469 NW2d 306 (1991). Because "[t]he habitual-offender statute does not create a substantive offense that is separate from and independent of the principal charge[,]" *id*., the number of peremptory challenges is expressly based "on the potential penalty for the charged *offense*." *Id*. Accordingly, despite the fact that the defendant in *Oswald* faced a potential sentence of life imprisonment because of habitual-offender enhancements, see *id*. at 9, this Court determined that the trial court did not err when it limited the defendant to only 5 peremptory challenges. *Id*. at 12.

Here, defendant was convicted in Count I of possession with intent to deliver a controlled substance in an amount of 50 grams or more, but less than 450 grams, see MCL 333.7401(2)(a)(*iii*), and in Count II of possession with intent to deliver a controlled substance in an amount less than 50 grams, see MCL 333.7401(2)(a)(*iv*). Under those statutes, the charged crimes carry maximum prison sentences of 20 years. MCL 333.7401(2)(a)(*iii*); MCL 333.7401(2)(a)(*iv*). At sentencing, the trial court noted that those two counts could carry a sentence of up to life imprisonment because of sentence enhancements. See MCL 769.12. Thus, this Court's ruling in *Oswald*, 188 Mich App at 12, is directly on point and establishes that defendant was not entitled to more than 5 peremptory challenges. Because the potential penalties for the charged crimes in Counts I and II do not include life imprisonment, see MCL 333.7401(2)(a)(*iii*); MCL 333.7401(2)(a)(*iv*), defendant was entitled to 5 peremptory challenges, regardless of sentence enhancements that were applied at sentencing. *Id*. Thus, the trial court did not err by limiting defendant to 5 peremptory challenges.

## D. JUDICIAL MISCONDUCT

Finally, defendant argues that the trial court violated the Code of Judicial Conduct when it questioned Sims outside the presence of the jury. "Due process requires that an unbiased and impartial decision-maker hear and decide a case." *People v Loew*, 340 Mich App 100, 110-111; 985 NW2d 255 (2022), lv gtd 979 NW2d 851 (2022). Because "the hallmark of the judiciary is impartiality," *id*. at 111, "a judge should act neither as an advocate nor an adversary in any criminal proceedings . . . ." *Id*. "A judge is presumed unbiased, and a defendant claiming judicial bias must overcome a heavy presumption of judicial impartiality." *Id*. (quotation marks omitted).

A trial judge "is generally permitted to ask questions of witnesses." *People v Swilley*, 504 Mich 350, 372; 934 NW2d 771 (2019). The "object of judicial questioning should be to clarify." *People v Stevens*, 498 Mich 162, 173; 869 NW2d 233 (2015). "Therefore, it is appropriate for a judge to question witnesses to produce fuller and more exact testimony or elicit additional relevant information." *Id*. A chief concern about judicial questioning is the impact on the jury. See *id*. at 174 (noting that "[i]t is essential that the judge not permit his own views on disputed issues of fact to become apparent to the jury." (quotation marks and citation omitted)).

Here, defendant contends that the trial court violated the Code of Judicial Conduct when it told Sims that defendant had implicated Sims as the actual owner of the drugs and gun at issue in this case. Defendant's trial defense was to implicate Sims. On the third day of trial, Sims appeared at the trial, but asserted his Fifth Amendment right and refused to testify. The next day, Sims once again appeared and indicated that he had changed his mind and was willing to testify. Outside the presence of the jury, the trial court asked Sims if he understood that defendant had implicated Sims as the owner of the drugs and gun. Sims responded that he did not know that. At that point, Sims

called his attorney. After the call, Sims informed the trial court that he would be asserting his Fifth Amendment right and would not be testifying.

In support of his argument that the trial court impermissibly participated in the examination process of the trial, defendant cites Code of Judicial Conduct, Canon 3(A)(12), which states:

> A judge may properly intervene in a trial of a case to promote expedition, and prevent unnecessary waste of time, or to clear up some obscurity, but the judge should bear in mind that undue interference, impatience, or participation in the examination of witnesses, or a severe attitude on the judge's part toward witnesses, especially those who are excited or terrified by the unusual circumstances of a trial, may tend to prevent the proper presentation of the cause, or the ascertainment of truth in respect thereto.

As an initial matter, we note that the trial court did not question Sims in front of the jury, so there can be no claim that the questioning affected the thinking of the jurors. In any event, defendant is not correct in claiming that the trial court's questioning of Sims amounted to judicial misconduct. Defendant has not established that the questioning of Sims fell outside the participation that a trial court is entitled to undertake. See Code of Judicial Conduct, Canon 3(A)(12); *Swilley*, 504 Mich at 372; *Stevens*, 498 Mich at 173. Defendant further insists that the trial court lied to Sims, thereby intentionally depriving defendant of a fair trial, but the trial-court record offers no support for those allegations. Thus, defendant has not established that the trial court committed judicial misconduct in any respect when questioning Sims outside the presence of the jury.

Affirmed.

/s/ Christopher P. Yates
/s/ Mark J. Cavanagh
/s/ Mark T. Boonstra

-14-